# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.  
LOWELL DIVISION

SUPERIOR COURT  
C.A. NO.

David K. and Kathleen MacDowell,

    Plaintiffs,

v.

Ameriquest Mortgage Company, AMC Mortgage Services, Deutsche Bank National Trustee, and Korde & Associates, P.C.

    Defendants

COMPLAINT SEEKING TO ENFORCE SETTLEMENT AGREEMENT AND TO SET ASIDE FORECLOSURE SALE

## I. PRELIMINARY STATEMENT

1. Plaintiffs, David and Kathleen MacDowell, (the "MacDowells"), have been tenants for over a year in the home they purchased 10 years ago and owned until Deutsche Bank National Trustee ("Deutsche Bank") foreclosed on the mortgage in February 2006. The circumstances leading to the MacDowells' financial struggles and the ultimate loss of their home began when they refinanced their home loan with Ameriquest Mortgage Company ("Ameriquest"). In the refinance transaction, Ameriquest charged high closing costs and misrepresented loan terms, preventing the MacDowells from understanding the cost of the loan they received.

2. When the MacDowells' adjustable rate jumped from 8.999% to 11.25%, they began to struggle with their substantially increased monthly mortgage payments to AMC Mortgage Services ("AMC") and ultimately entered into a forbearance agreement. Throughout the forbearance period, AMC failed to provide the MacDowells with

accurate and consistent information about the amounts they owed to reinstate their mortgage. Despite the MacDowells' efforts to make payments under the forbearance agreement, including a large lump sum of $19,000.00, AMC referred the case to Korde & Associates, P.C. ("Korde") for foreclosure proceedings.

3. Throughout the foreclosure process, Korde sent inconsistent foreclosure-related notices and ultimately sold the MacDowells' home despite the disputes relating to the forbearance agreement.

4. The MacDowells, through counsel, reached a settlement agreement with Ameriquest, represented by Korde, to resolve these issues. Ameriquest has not honored the agreement. By this action, the MacDowells seek damages as well as declaratory and injunctive relief to enforce the settlement agreement.

## II. PARTIES

5. The MacDowells are natural persons who reside at 425 Wheeler Road, Dracut, Massachusetts 01826.

6. Ameriquest is a Delaware corporation whose principal place of business is at 1100 Town & Country Road, Orange, California 92000.

7. AMC is a Delaware corporation with its principal place of business in California. It is a wholly-owned subsidiary of ACC Capital Holdings Corporation. It services many of the loans originated by AMC.

8. Deutsche Bank is a mortgage holder whose principal place of business is located at 60 Wall Street, New York, New York 10005.

9. Korde is a professional corporation duly organized under Massachusetts law, with a principal place of business located at 321 Billerica Road, Suite 210, Chelmsford, Massachusetts 01824.

10. Collectively, Ameriquest, AMC, Deutsche Bank and Korde will be referred to as the "Defendants."

### III.   FACTS

11. The MacDowells are unsophisticated individuals with little experience in real estate transactions or mortgage finance.

12. The MacDowells purchased their Dracut home in 1996 for $169,900.00.

13. The MacDowells' previous home mortgage loan was with Ocwen Federal Bank (the "Ocwen" loan). The MacDowells considered the Ocwen loan to be on advantageous terms. They made all of the payments required by the Ocwen loan.

14. Ameriquest solicited the MacDowells by telephone and mail to refinance their Ocwen loan, which the MacDowells did on August 17, 2002 to consolidate some of their other debts and to obtain cash out. Based on their discussions with Ameriquest, the MacDowells understood that they were applying for a 15-year loan with $150,000 cash out and no prepayment penalty.

15. The loan was characterized by high closing costs, including "discount points" totaling $7,900.00, and an adjustable rate of 8.999%, and contained a prepayment penalty.

16. The MacDowells believe and therefore aver that they were not provided with a "discount" of any kind on the rate in the transaction.

17. The MacDowells were never offered an alternative loan with a higher rate that did not involve payment of discount points. Therefore, they had no opportunity to evaluate whether the "discount" would be advantageous to them.

18. Ameriquest Mortgage Company sold the MacDowells loan to Deutsche Bank.

19. AMC Mortgage Services ("AMC"), acting as an agent for Deutsche Bank, is the servicer of the August 17, 2002 loan.

20. In or about November, 2005, the MacDowells entered into a forbearance agreement to cure arrearage on the loan, which they began to accrue after the interest rate on the loan jumped from 8.999% to over 11%.

21. On December 2, 2005, the MacDowells made a lump sum payment to AMC of $19,000.00, pursuant to a telephone conversation Mrs. MacDowell had with Yedelyn Delaney in the home retention department.

22. On or about December 15, 2005, the MacDowells received two notices from Korde & Associates, P.C., ("Korde"), foreclosure attorneys for Deutsche Bank, stating that a foreclosure sale was scheduled for the following day, December 16, 2005 at 2:30 p.m.

23. Confused and panicked, the MacDowells called AMC several times to inquire about the December 16, 2005 sale date and received no responses. In addition, the MacDowells called Korde, who told them that the notices were sent in error.

24. The first foreclosure sale notice the MacDowells received was for another borrower, Marilyn Granger.

25. The second foreclosure sale notice the MacDowells received had their

name on it, but it was sent in error.

26.   As a result of receiving these two erroneous foreclosure sale notices, the MacDowells suffered severe emotional distress, believing that they were within hours of losing their home where they live with their 3 children.

27.   On or about February 17, 2006, the MacDowells received a letter from AMC dated January 31, 2006, which states; "We regret to inform you that the previously approved Forbearance Agreement dated   ,[1] has been canceled. Our decision to cancel this agreement is based on your failure to deliver to us the payment of $1,340.46 which was due January 30, 2006....A sale date is set for February 21, 2006. No further notice will be sent to you."

28.   A true and correct copy of the January 31, 2006 letter is attached hereto as Exhibit A.

29.   The MacDowells did not receive the January 31, 2006 letter until February 17, 2006.

30.   Upon receiving the January 31, 2006, letter on February 17, 2006, Mrs. MacDowell made numerous phone calls to AMC to find out how much the MacDowells owed under the forbearance agreement. Mrs. MacDowell was unable to obtain this information from any of the AMC representatives with whom she spoke.

31.   Korde sent the MacDowells a letter, dated February 7, 2006, notifying them of the February 21, 2006 sale date at 10:00 a.m. The letter did not state an amount the MacDowells could pay to prevent the foreclosure sale.

32.   The MacDowells did not receive the February 7, 2006 letter until February

---

[1] The letter did not contain the date of the forbearance agreement to which it related.

5

19, 2006.

33. A true and correct copy of the February 7, 2006 letter is attached hereto as Exhibit B.

34. On information and belief, the February 7, 2006 letter was the "Notice of Sale" required by M.G.L. c. 244 §14 as a prerequisite for foreclosing the mortgage.

35. On February 18, 2006, still unsure of how much money they needed to send to AMC to prevent the February 21, 2006 foreclosure sale, Mrs. MacDowell attempted to make a $6,700.00 payment to AMC by Western Union.

36. Due to it being a holiday weekend, President's Day, Mrs. MacDowell was unable to make the Western Union payment until Tuesday morning, February 21, 2006.

37. On February 18, 2006, Mrs. MacDowell sent a letter to Ameriquest, to the attention of the representatives in the home retention department, requesting information about how much they owed and explaining that they were prepared to make a $6,700.00 payment, but could not send it until the following Tuesday, February 21, 2006, because of the holiday weekend, and that she and Mr. MacDowell were willing, able and ready to make the payment to stop the foreclosure sale on the morning of February 21, 2006.

38. A true and correct copy of the February 18, 2006 letter Mrs. MacDowell sent to AMC is attached hereto as Exhibit C.

39. Mrs. MacDowell sent the $6,700.00 payment to AMC through Western Union on the morning of February 21, 2006 at approximately 9:30 a.m., while she was working a double shift as a nurse.

40. At this time, the MacDowells still did not know whether they owed $1,340.46 as AMC stated in its January 31, 2006 letter or $6,700.00 under the

forbearance agreement. The MacDowells believed that they would be able to prevent the foreclosure sale by sending the higher amount of $6,700.00.

41. The amounts that the MacDowells were required to pay to reinstate their mortgage and avoid foreclosure included foreclosure-related attorneys fees and costs that they believe and therefore aver were excessive and not due and owing. Korde's charging of these excessive foreclosure-related fees and costs contributed to the MacDowells struggles to cure their default.

42. Later that morning, Mrs. MacDowell returned home from a double shift, to find her two daughters crying with her neighbor, and an auctioneer who told her that he had just sold her home.

43. The MacDowells believe and therefore aver that they were current on their forbearance agreement when their home was sold.

44. Korde sent a letter dated February 21, 2006 addressed to the "Occupant" at 45 Wheeler Road, Dracut, informing them; "Please be advised that a foreclosure sale was held today regarding a mortgage given by David K. MacDowell and Kathleen MacDowell to Ameriquest Mortgage Company. The purchaser at the foreclosure sale was Ameriquest Mortgage Company."

45. On or about March 11, 2006, the MacDowells received a 72 Hour Notice To Quit and Vacate Premises from Korde, advising that Deutsche Bank is the owner of 425 Wheeler Road and that the MacDowells must vacate the premises within 72 hours. The notice was dated March 7, 2006.

46. On or about March 17, 2006, Ms. MacDowell returned home to find an eviction summons and complaint taped to her front door (Case No. 06-11SU0699 –

7

District Court Department, Lowell Division), requiring a reply prior to the hearing date set for April 6, 2006.

47. The MacDowells answered the eviction complaint and raised counterclaims, through counsel, on April 3, 2007.

48. On June 20, 2006, the parties filed a Stipulation of Dismissal of the eviction case No. 06-11SU0699, pending settlement negotiations.

49. The parties reached an agreement, memorialized in the June 13, 2007 letter attached as Exhibit D, whereby Ameriquest will deed the property located at 425 Wheeler Road, Dracut, MA back to the MacDowells and originate a new 30-year fixed loan with Ameriquest that contains no restrictions on refinancing with another lender, no points and fees, and no prepayment penalty.

50. The settlement agreement is further memorialized in a series of correspondences between counsel for the MacDowells and Korde.

51. As part of this agreement, the MacDowells have provided Ameriquest with all of their relevant financial information, and had an appraisal conducted on their property.

52. In accordance with the agreement, Ameriquest provided the MacDowells with some preliminary loan documents dated November 7, 2006, including a Truth In Lending Statement providing a fixed APR of 8.990%. The Truth In Lending Statement incorrectly provided for a prepayment penalty.

53. However, to date, Ameriquest has not executed the transactions necessary to deed the property back to the MacDowells, has not provided final loan documents to the MacDowells, or set a closing date for the new loan.

## COUNT I: INJUNCTIVE RELIEF TO ENFORCE SETTLEMENT AGREEMENT

54. The Defendants and the MacDowells had a valid and enforceable settlement agreement based upon good and valuable consideration.

55. The Defendants have refused to honor the settlement agreement.

56. The MacDowells are entitled to injunctive relief to enforce the settlement agreement.

## COUNT II: UNCONSCIONABILITY AND/OR ILLEGALITY
(As Against Ameriquest)

57. The MacDowells repeat and reallege all paragraphs above as if set forth fully herein.

58. Contract terms that violate the Division of Banks regulations, 209 C.M.R. 32.00, et seq., and/or the Attorney General's regulation, 940 C.M.R. § 3.01 et seq., 6.01 et seq., 8.01 et seq. are void or voidable for illegality and unenforceable.

59. Contract terms that violate the Division of Banks regulations and/or the Attorney General's regulations are unconscionable and unenforceable.

60. Said contract terms are void or voidable as a matter of public policy.

61. The MacDowells are entitled to relief from unconscionable and/or illegal contract terms including but not limited to cancellation and/or refund of unjustified points and other closing costs.

## COUNT III: BREACH OF CONTRACT
(As Against Ameriquest For Bait And Switch)

62. The MacDowells repeat and reallege all paragraphs above as if set forth fully herein.

63. Ameriquest offered the MacDowells different terms in its oral disclosures than the ones it offered at closing.

64. To the extent that Ameriquest offered terms to the MacDowells prior to closing, Ameriquest formed contracts with the MacDowells to provide those promised terms.

65. Promised terms included, without limitation: a 15-year term, $150,000 cash out, and no prepayment penalty.

66. By delivering different terms at closing than the ones initially promised, Ameriquest breached its contracts with the MacDowells.

67. Ameriquest's conduct caused the MacDowells irreparable harm including, without limitation, increasing the amount of monthly payments owed to unaffordable levels thereby putting them at imminent risk of foreclosure, as well as by discouraging the MacDowells from refinancing at more affordable rates through its imposition of undisclosed/unjustified loan discount fees in conjunction with prepayment penalties.

68. Ameriquest's conduct increased the cost of the loan to the MacDowells.

69. The MacDowells are therefore entitled to damages and equitable remedies for Ameriquest breach of the loan contract.

**COUNT IV: BREACH OF CONTRACT**
**(As Against Ameriquest For Discount Points)**

70. The MacDowells repeat and reallege all paragraphs above as if set forth fully herein.

71. Ameriquest formed contracts with the MacDowells by charging loan discount fees in exchange for providing a discounted interest rate. Ameriquest then failed to provide the required discount.

72. The MacDowells' loan was at an interest rate that was at or above Ameriquest's "par rate," even though the loan involved substantial payments for a rate discount.

73. By failing to provide agreed-upon discounted interest rates, Ameriquest breached the MacDowells' loan contract, causing damages.

74. Ameriquest's breach of contract is in violation of the common law of contract of Massachusetts, where Ameriquest does business.

75. As a result of Ameriquest's breach of contract, the MacDowells have suffered and continue to suffer damages in an amount to be determined according to proof at time of trial.

### COUNT V: INTENTIONAL MISREPRESENTATION
### (As Against Ameriquest)

76. The MacDowells repeat and reallege all paragraphs above as if set forth fully herein.

77. Ameriquest made misrepresentations to the MacDowells, upon which the MacDowells relied to their detriment.

78. Ameriquest's misrepresentations included, without limitation:

    a. making preliminary oral disclosures pertaining to the loan term, the amount of cash out the MacDowells would receive, and a prepayment penalty provision; and

    b. promising a discounted rate in connection with payment of "discount points" without providing said discount.

11

79. Ameriquest made these misrepresentations to induce the MacDowells to enter into refinancing agreements with it.

80. The MacDowells were induced to enter into a refinancing agreement with Ameriquest and suffered damages as a result.

81. Ameriquest's practices caused the MacDowells harm including, without limitation, increasing the amount of monthly payments owed to an unaffordable level thereby putting the MacDowells at imminent risk of foreclosure, and preventing the MacDowells from refinancing with other lenders to obtain more favorable terms through its imposition of undisclosed/unjustified points and prepayment penalties.

82. The MacDowells are entitled to damages and equitable remedies for Ameriquest's intentional misrepresentation.

### COUNT VI: BREACH OF CONTRACT
### (As Against AMC)

83. The MacDowells repeat and reallege all paragraphs above as if set forth fully herein.

84. AMC serviced the MacDowells' loan.

85. The MacDowells had a forbearance agreement that set forth a payment schedule under which the MacDowells could make monthly payments to cure their default.

86. The MacDowells believe and therefore aver that they satisfied their obligations by making timely payments under the forbearance agreement.

87. Any inconsistencies in the MacDowells' payments under the forbearance agreement resulted from AMC providing confusing and wrong information about

amounts due and owing under the agreement and/or from AMC's misapplication of the MacDowells' payments.

88.     The amounts that the MacDowells were required to pay to cure their default and avoid foreclosure included foreclosure-related attorneys fees and costs that they believe and therefore aver were excessive and not due and owing.

89.     By misinforming the MacDowells about their obligations under the forbearance agreement and misapplying the MacDowells' payments, AMC breached its contract with the MacDowells.

90.     By charging excessive foreclosure-related fees and costs AMC breached its contract with the MacDowells.

91.     As a result of AMC's breach of contract, the MacDowells have suffered and continue to suffer damages, including, without limitation, the loss of their home, in an amount to be determined according to proof at time of trial.

### COUNT VII: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
(As Against Ameriquest And AMC)

92.     The MacDowells repeat and reallege all paragraphs above as if set forth fully herein.

93.     The contracts between the MacDowells and Ameriquest, and the MacDowells and AMC, included a duty of good faith and fair dealing. Pursuant to an implied covenant in the subject contracts, Ameriquest and AMC had a duty not to do anything which would deprive the MacDowells of the benefits of those contracts, and had a duty to do everything that the contracts presupposed each of the parties would do to accomplish the purpose or purposes of the subject contracts.

13

94. Ameriquest acted in breach of the implied covenant of good faith and fair dealing, and its duties thereunder, when it offered terms to the MacDowells prior to closing, and failed to provide those promised terms.

95. Ameriquest acted in breach of the implied covenant of good faith and fair dealing, and its duties thereunder, when it failed to provide agreed-upon discounted interest rates.

96. AMC acted in breach of the implied covenant of good faith and fair dealing, and their duties thereunder, when it misrepresented the MacDowells' payment obligations under their forbearance agreement and misapplied the MacDowells' payments under their forbearance agreement.

97. As a result of Ameriquest's and AMC's wrongful conduct, the MacDowells have suffered and continue to suffer economic losses and other damages, including, without limitation, the loss of their home, all in an amount to be determined according to proof at time of trial, including attorney fees and reasonable costs.

### COUNT VIII: UNJUST ENRICHMENT
### (As Against Ameriquest and AMC)

98. The MacDowells repeat and reallege all paragraphs above as if set forth fully herein.

99. By its wrongful acts and omissions, including but not limited to making and servicing predatory and unfair mortgage loans described herein, Ameriquest and AMC have been unjustly enriched at the expense of the MacDowells, and thus the MacDowells have been unjustly deprived.

100. By reason of the foregoing, the MacDowells seek restitution from Ameriquest and AMC, and an order of this Court disgorging all profits, benefits, and other compensation obtained by Ameriquest and AMC from their wrongful conduct.

### COUNT VIV: BREACH OF FIDUCIARY DUTY
(As Against Deutsche Bank)

101. The MacDowells repeat and reallege all paragraphs above as if set forth fully herein.

102. When it became the holder of the MacDowells' mortgage, Deutsche Bank assumed fiduciary duties to the MacDowells.

103. Deutsche Bank's fiduciary duties require it to act in good faith and use reasonable diligence to protect the MacDowells' interest.

104. Deutsche Bank owed the MacDowells a higher duty of the strictest good faith and utmost diligence when, as a holder of their mortgage with the power to sell, it also acted as the purchaser of the Dracut property at the foreclosure sale.

105. Deutsche Bank did not use good faith and reasonable diligence, and therefore breached its fiduciary duty to the MacDowells, when it foreclosed on their mortgage while its agent, AMC, was failing to provide the MacDowells with appropriate notice and an accurate accounting of what they owed under the forbearance agreement.

106. The MacDowells suffered damages as a result of Deutsche Bank's breach.

### COUNT X: WRONGFUL FORECLOSURE
(As Against Deutsche Bank And Korde)

107. The MacDowells repeat and reallege all paragraphs above as if set forth fully herein.